UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Wasen A.,[1]

               Plaintiff,                    Court File No.  18-cv-03242 (SRN/LIB)

      v.                               **REPORT AND RECOMMENDATION**

Andrew Saul,
Acting Commissioner of Social Security,

               Defendant.

---

      Plaintiff, Wasen A. (hereinafter "Plaintiff"), seeks judicial review of the decision of the Commissioner of Social Security ("Defendant") denying her application for disability benefits. This matter has been referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g). Both parties submitted cross-motions for summary judgment, [Docket Nos. 12, 14], and the Court took the matter under advisement on the written submissions.

      For the reasons discussed below, the Court recommends that Plaintiff's Motion for Summary Judgment, [Docket No. 12], be **DENIED**, and that Defendant's Motion for Summary Judgment, [Docket No. 14], be **GRANTED**.

---

[1] This District has adopted the policy of using only the first name and last initial of any nongovernmental parties in Social Security opinions such as the present Order. Accordingly, where the Court refers to Plaintiff by her name only her first name and last initial are provided.

## I.  Procedural History

On July 30, 2015, Plaintiff filed an application for supplemental security income. (Tr. 17).[2] Plaintiff alleged that her disability began on January 1, 2015. (Tr. 17). The Commissioner initially denied Plaintiff's present claims on December 30, 2015, and again, upon reconsideration, on February 15, 2018. (Tr. 17). On March 7, 2016, Plaintiff filed a written request for a hearing before an Administrative Law Judge. (Tr. 17).

Administrative Law Judge Virginia Kuhn (the "ALJ") conducted a hearing on February 15, 2018. (Tr. 17, 42). Plaintiff was represented by legal counsel at the administrative hearing. (Tr. 17, 42). Plaintiff, an impartial medical expert, Dr. Lace, and an impartial vocational expert ("VE"), Cheryl Zilka ("IVE Zilka"), testified at the hearing. (Tr. 17). On May 24, 2018, the ALJ issued a decision denying Plaintiff's request for supplemental security income. (Tr. 17–31). The ALJ concluded that Plaintiff was not disabled within meaning of the Social Security Act. (Tr. 31).

Plaintiff thereafter sought review of the decision by the Appeals Council. (Tr. 1, 165). Subsequently, on September 25, 2018, the Appeals Council denied Plaintiff's request for review. (Tr. 1–5). Accordingly, the ALJ's decision became the final decision of the Commissioner. See, 20 C.F.R. §§ 404.981, 416.1481.

On November 23, 2018, Plaintiff filed the present action. (Compl. [Docket No. 1]).

## II.  Standards of Review

If a claimant's initial application for disability benefits is denied, she may request reconsideration of the decision. 20 C.F.R. §§ 404.907–404.909. A claimant who is dissatisfied

---

[2] Throughout this Order, the Court refers to the Administrative Record, [Docket No. 10], by the abbreviation "Tr." The Administrative Record is consecutively paginated across 62 exhibits. (See, Administrative Record [Docket No. 10]). Where the Court cites to the Administrative Record, it refers to the page numbers found in the bottom-right corner of these exhibits.

with the reconsidered decision may then obtain administrative review by an administrative law judge. 42 U.S.C. § 405(b)(1); 20 C.F.R. § 404.929.

To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis. This analysis requires the ALJ to make a series of factual findings regarding the claimant's impairments, residual functional capacity, age, education, and work experience. See, 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also, Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). The Eighth Circuit has described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

If the claimant is dissatisfied with the ALJ's decision, she may request review by the Appeals Council, although the Appeals Council need not grant that request for review. See, 20 C.F.R. §§ 404.967–404.982. The decision of the Appeals Council (or, if the request for review is denied by the Appeals Council, then the decision of the ALJ) is final and binding upon the claimant, unless the matter is appealed to federal district court within sixty days after notice of the Appeals Council's action. See, 42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

In the present case, the Appeals Council declined to review the ALJ's decision finding that Plaintiff was not disabled, (Tr. 1–5), thus making the ALJ's decision effectively the final decision of the Commissioner.

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. Judicial review of the decision to deny disability benefits, however, is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005); Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) ("We may reverse and remand findings of the Commissioner [through the ALJ] only when such findings are not supported by substantial evidence on the record as a whole."). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). The Court should not reverse the Commissioner's finding merely because evidence may exist in the administrative record to support the opposite conclusion. Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision [through the ALJ], the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within

the 'available zone of choice.'" <u>Bradley v. Astrue</u>, 528 F.3d 1113, 1115 (8th Cir. 2008). The decision of the ALJ "is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." <u>Id.</u> "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." <u>Medhaug v. Astrue</u>, 578 F.3d 805, 813 (8th Cir. 2009) (quotation omitted).

The claimant bears the burden under the Social Security Act of proving that she is disabled. <u>See</u>, 20 C.F.R. § 404.1512(a); <u>Whitman v. Colvin</u>, 762 F.3d 701, 705 (8th Cir. 2014). Once the claimant has demonstrated she cannot perform prior work due to a disability, the burden then shifts to the Commissioner to show that the claimant retains the residual functional capacity ("RFC") to engage in some other substantial, gainful activity. <u>Goff v. Barnhart</u>, 421 F.3d 785, 790 (8th Cir. 2005).

## III. Decision Under Review

Before beginning the five-step disability evaluation process in the present case, the ALJ first decided to admit some, but not all, of the untimely additional written evidence that Plaintiff submitted following the hearing. (Tr. 17). The ALJ decided not to admit a letter written by Dr. Beyzavi, dated February 15, 2018, (the "February Letter") finding that "it could have and should have been admitted in a timely fashion." (Tr. 17; <u>see</u> <u>also</u>, Tr. 38–39). Plaintiff challenges this decision. The ALJ also decided not to admit a letter written by Plaintiff's counsel, dated February 15, 2018. (Tr. 18).  Plaintiff does not challenge this decision.

Thereafter, the ALJ made the following determinations during the five-step disability evaluation process.

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since July 30, 2015, Plaintiff's application date. (Tr. 20). This finding is not in dispute.

At step two, the ALJ concluded that Plaintiff had "the following severe impairments: major depressive disorder; generalized anxiety disorder; posttraumatic stress disorder; and headaches." (Tr. 20). Plaintiff challenges the findings made by the ALJ at step two.

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21). Specifically, the ALJ found that Plaintiff did not have any impairment or combination of impairments which met or medically equaled listing 1.04, 11.02, 12.04, 12.06, or 12.15. (Tr. 21–24). Plaintiff does not challenge the ALJ's findings at step three.

At step four, the ALJ made the following RFC determination:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple routine, repetitive types of tasks and instructions that are fixed and predictable from day to day and would align with a specific vocational preparation of a one or a two as defined in the Dictionary of Occupational Titles, and these tasks would not be fast paced and would not involve a production quota or a production pace such as might be found on an assembly line and this would be a work setting where there would be no fast pace production quota involved so there would be no individuals checking the work or checking the production quotas, and occasional superficial interaction with coworkers and the public.

(Tr. 24). Plaintiff challenges this RFC determination made by the ALJ.

In making this RFC determination, the ALJ, considering the record as a whole, found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," however, the ALJ also noted that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . . The overall evidence generally does not support

the alleged loss of functioning." (Tr. 25). Plaintiff does not directly challenge this credibility finding by the ALJ.

The ALJ found that Plaintiff had no past relevant work. (Tr. 29). Plaintiff does not challenge this finding.

Finally, at step five, the ALJ concluded that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform." (Tr. 30). Relying upon testimony from IVE Zilka, the ALJ specifically found that among the occupations Plaintiff would be able to perform were "laundry laborer" of which there are 35,000 positions in the national economy and 1,500 positions in the economy of Minnesota; "cart attendant" of which there are 126,000 positions in the national economy and 2,200 positions in the economy of Minnesota; and "truck cleaner" of which there are 43,000 positions in the national economy and 1,000 positions in the economy of Minnesota. (Tr. 47–48). Other than implicit challenges based on Plaintiff's challenge of the ALJ's findings at step two and four, Plaintiff does not challenge the ALJ's findings at step five.

Accordingly, the ALJ found that Plaintiff was not under a disability, as that term is defined by the Social Security Act, at any time during the adjudicated period. (Tr. 48–49).

## IV. Analysis

Plaintiff asserts two overarching issues on her appeal of the ALJ's decision: (1) whether "Dr. Beyzavi's February 15, 2018 letter should have entered the record" (See, Plf.'s Mem., [Docket No. 12], at 10–15); and (2) whether the ALJ's finding that Plaintiff was not disabled is supported by substantial evidence in the record. (See, Id. at 15–22).

Plaintiff contends that the ALJ should have admitted the untimely February Letter because its submission "fall[s] squarely within the 'unavoidable circumstance' language of 20 C.F.R. § 416.1435(b)." (Id. at 13).

Plaintiff also contends that the ALJ's finding that Plaintiff was not disabled is not supported by substantial evidence because the ALJ: improperly weighed opinion evidence, (see, Id. at 16–18); erred by failing to identify Plaintiff's back problems as a severe impairment, (see, Id. at 18–19); failed to incorporate all Plaintiff's limitations into the RFC, (see, Id. at 19–21); and failed to address discrepancies between IVE Zilka's testimony and the Dictionary of Occupational Titles ("DOT"), (see, Id. at 21–22).

### A.  The February Letter

Plaintiff brings two arguments as to why the untimely submitted February 2018 Letter of Dr. Beyzavi should have been admitted.  First, Plaintiff argues that the ALJ should have admitted the February Letter under an exception to the Five-Day Rule.  Second, Plaintiff argues that the February Letter should have been admitted by the Appeals Council as additional evidence that was new, material, and related to the period on or before the date of the ALJ's decision.  This Court will consider each argument in turn.

### 1. The ALJ

Plaintiff argues that the ALJ should have admitted the February Letter under the "unavoidable circumstances" language of 20 C.F.R. § 416.1435(b). (Plf.'s Mem., [Docket No. 12], at 13).

"Each party must make every effort to ensure that the administrative law judge receives all of the evidence and must inform us about or submit any written evidence, as required in § 416.912, no later than 5 business days before the date of the scheduled hearing" (the "Five-Day Rule"). 20

C.F.R. § 416.1435(a). If a claimant fails to comply with this requirement, the ALJ "may decline

to consider or obtain the evidence," 20 C.F.R. § 416.1435(a), unless the claimant: (1) was misled

by an action taken by the Social Security Administration; (2) had physical, mental, or linguistic

limitations that prevented her from submitting the evidence earlier; or (3) was prevented from

submitting the evidence earlier by "[s]ome other unusual, unexpected, or unavoidable

circumstance" beyond her control, 20 C.F.R. § 416.1435(b).

> In providing guidance regarding what is often termed the "Five-Day Rule," the SSA recognized "that there will be circumstances in which claimants cannot produce evidence at least five business days before the hearing." Therefore, the SSA "included appropriate exceptions to the 5-day requirement to ensure fairness when a claimant or his or her representative actively and diligently seeks evidence but is unable to obtain it." Regarding the listed exception concerning unexpected or unavoidable circumstances beyond the claimant's control, the SSA removed the phrase "through no fault of your own" in order "to ensure that our adjudicators interpret this exception consistent with [the SSA's] intent." The SSA further explained that the words "actively" and "diligently" are intended to be interpreted using their ordinary English usage. Therefore, the SSA advised that when "a claimant or representative shows that he or she made a good faith effort to timely request, obtain, and submit evidence, but he or she did not receive the evidence in time to submit it at least 5 business days before the hearing because of circumstances outside his or her control, we expect that our adjudicators would find that this standard is met."

Midkiff v. Berryhill, No. 2:18-cv-00338, 2018 WL 8620562, at *9 (S.D.W. Va. Dec. 10, 2018),

report and recommendation adopted by 2019 WL 1258845 (S.D.W. Va. Mar. 19, 2019) (alteration

in original) (citations omitted) (quoting Ensuring Program Uniformity at the Hearing and Appeals

Council Levels of the Administrative Review Process, 81 Fed. Reg. 90987, 90990, 2016 WL

7242991 (Dec. 16, 2016)).

The mere showing that a medical opinion did not exist five days prior to the hearing does

not establish an unusual, unexpected, or unavoidable circumstance beyond the claimant's control.

Id. at *10; see also, Winfield v. Comm'r of Soc. Sec. Admin., No. 1:18-cv-01635, 2019 WL

3619403, at *11 (N.D. Ohio July 16, 2019), report and recommendation adopted by 2019 WL

3574889 (N.D. Ohio Aug. 6, 2019) (finding the ALJ did not err in rejecting a doctor's statement that did not exist five days before the hearing when through due diligence the plaintiff could have obtained it sooner); Arthur L. v. Berryhill, No. 5:18-cv-304 (FJS/DJS), 2019 WL 4395421, at *3–4 (N.D.N.Y. June 6, 2019), report and recommendation adopted by 2019 WL 3213229 (N.D.N.Y. July 17, 2019) (same). A claimant must additionally show due diligence and that the delay was outside of her control. Midkiff, 2018 WL 8620562 at *10, 11; see also, Kline v. Berryhill, No. 3:18-cv-00180-FDW, 2019 WL 1782133, at *4 (W.D.N.C. Apr. 23, 2019) ("Ultimately, it was the Plaintiff's responsibility to demonstrate an exceptional reason why she failed to timely produce the medical statements, including whether she actively and diligently sought the late-filed evidence.").

Here, the ALJ declined to admit the February 2018 Letter of Dr. Beyzavi finding that it was not timely submitted and that "[n]o exception had been established" to the Five-Day Rule. (Tr. 18). The ALJ explained her rational for rejecting the document by stating that the February Letter was "from a long-term provider known to the claimant's representative, and it could have been and should have been admitted in a timely fashion." (Tr. 17). For the reasons outlined below, this Court finds the ALJ did not err in this decision.

Plaintiff argues that her untimely submission of the February Letter falls into the "unavoidable circumstances" exception because the February Letter "did not come into existence until after the hearing." (See, Plf.'s Mem., [Docket No. 12], at 13). However, as already noted, the mere fact that a letter did not exist prior to the hearing does not establish an exception to the Five-Day Rule. Plaintiff must also show that she exercised due diligence in obtaining the February Letter and that the delay was outside of her control. See, Winfield, 2019 WL 3619403, at *11; Arthur L., 2019 WL 4395421, at *3–4; Midkiff, 2018 WL 8620562, at *10–11.

Plaintiff further argues that the delay was due to an unavoidable circumstance because it was admitted to rebut the hearing testimony of Dr. Lace. (Plf.'s Mem., [Docket No. 12], at 13). Plaintiff states that during the hearing, "Dr. Lace opined that Dr. Beyzavi's notes . . . appeared to be [Plaintiff's] self-reports of symptoms rather than Dr. Beyzavi's own observations and conclusions about [Plaintiff's] limitations." (Id.). Plaintiff contends that it was necessary to seek additional clarification from Dr. Beyzavi "[t]o respond to this alleged discrepancy." (Id.). Plaintiff asserts that the February Letter "was intended to resolve the alleged discrepancy of whether the treatment notes contained self-report of symptoms versus Dr. Beyzavi's observations," as well as, "to confirm that the opinion statement dated February 2, 2016 was an accurate assessment based upon a review of contemporaneous handwritten treatment records." (Id.).

Implicit in this argument is Plaintiff's assumption that Dr. Lace and the ALJ were unable to read Dr. Beyzavi's handwritten notes, and therefore a transcription was required. (See, Id.; see also, Tr. 37). Indeed, in the letter Plaintiff's counsel sent to the ALJ on February 15, 2018,[3] shortly before submitting the February Letter at issue, Plaintiff's counsel explicitly stated, "My review of the treatment notes indicates some of the handwritten notes are difficult to read." (Tr. 37). Plaintiff's counsel then recited verbatim several quotes from Dr. Beyzavi's notes and stated that he "requested that Dr. Beyzavi dictate these handwritten notes so that we can get a better understanding of her impressions of the claimant." (Id.).

The record does not support Plaintiff's assumption that Dr. Beyzavi's handwritten notes were unreadable. To the contrary, Dr. Lace testified at the hearing, during his examination by the ALJ, that he found Dr. Beyzavi's February 2, 2016, opinion, which states that Plaintiff has "severe limitations in several areas," was not consistent with the rest of the record, and that Dr. Beyzavi's

---

[3] This Court notes that the ALJ also declined to admit this letter, however, Plaintiff has not challenged that decision. (See, Tr. 18).

handwritten notes were not useful because they did not contain "a lot of commentary with regard to [the] severity" of Plaintiff's symptoms. (Tr. 53). In Dr. Lace's examination by Plaintiff's counsel, he further explained that Dr. Beyzavi's notes contained a lot of references to Plaintiff's physical symptoms, but "not a lot of commentary regarding the severity of the mental health symptoms" and that "where there is commentary it's more self-report as opposed to objective statements regarding severity." (Tr. 57). In support of his observations, Dr. Lace was able to point to specific statements contained in the notes, which indicates that he was able to read them. (See, Tr. 57).

Accordingly, the assumption that Dr. Lace or the ALJ were unable to read Dr. Beyzavi's handwritten notes is not supported by the record, and therefore, the untimely submission of Dr. Beyzavi's February 2018 Letter was not due to any "unavoidable circumstance."

To the extent that Plaintiff deemed it necessary to obtain a transcription of Dr. Beyzavi's notes because "some of the handwritten notes are difficult to read," Plaintiff offers no evidence, nor has this Court found any upon review of the record as a whole, to support an assertion that through due diligence Plaintiff could not have been able, for reasons outside her control, to obtain and submit a transcript of Dr. Beyzavi's notes in a timely manner. See, Winfield, 2019 WL 3619403, at *11; Arthur L., 2019 WL 4395421, at *3–4; Midkiff, 2018 WL 8620562, at *10.

Plaintiff further contends that post-hearing evidence is generally admitted to respond to matters that occurred at the hearing. (Plf.'s Mem., [Docket No. 12], at 12). In support of that contention, Plaintiff cites to McClesky v. Astrue, 606 F.3d 351 (7th Cir. 2010), and Palombo v. Berryhill, No. 17-cv-284, 2018 WL 3118286 (D.N.H. June 25, 2018). (Id.). Plaintiff's reliance is misplaced. McClesky states that an ALJ may reopen a hearing at any time prior to her decision "to receive new and material evidence," and notes that admission of post-hearing evidence is often

admitted "to rebut vocational 'expert' testimony which cannot be anticipated prior to hearing." 606 F.3d at 354 (citations and quotations omitted). Likewise, Palombo finds that evidence used to rebut a VE's testimony falls under the "unavoidable circumstances" exception because it cannot be anticipated prior to the hearing. 2018 WL 3118286, at *5. These cases, however, do not apply in the present matter for two reasons.

First, both of Plaintiff's cited cases involve the rebuttal of VE testimony. See, McClesky, 606 F.3d at 354; Palombo, 2018 WL 3118286, at *5. Unlike VE testimony, which cannot be readily anticipated, contrary medical opinions such as by Dr. Lace which would challenge Dr. Beyzavi's opinion could and should have been anticipated by Plaintiff.

Second, and more to the point, the evidence contained in the February Letter is not "new." (See, Tr. 38–39). "To be 'new,' evidence must be more than merely cumulative of other evidence in the record." Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)). Here, the February Letter consists of a rehashed recitation of the impairments that Dr. Beyzavi diagnosed Plaintiff with, a verbatim transcription of portions of Dr. Beyzavi's handwritten notes, and a brief description of the last session Dr. Beyzavi had with Plaintiff. (Tr. 38–39). Dr. Beyzavi's diagnoses are well-documented in the record, thus they are not new. (See, e.g., Tr. 379–81, 557–70). The transcriptions are taken verbatim from Dr. Beyzavi's discernable notes which are already in the record, and thus they are not new. (See, e.g., Tr. 379–81, 558–64). Dr. Beyzavi's description of Plaintiff's last session merely states:

> At our last session on 2-14-2018 [Plaintiff] reported to this therapist that her anxiety has worsen [sic] affecting her heart pounding very fast and having severe pain on her arms. She was seen by her physician who prescribed her medication to take (she could not remember the name of the medication and forgot to bring it to the session).

(Tr. 38). This description of the February 14, 2018, visit is merely consistent with Dr. Beyzavi's notes from previous sessions where Plaintiff also self-reported increasing anxiety. (See, e.g., Tr. 558–64). Moreover, Plaintiff already reported these symptoms to Dr. Mohamed on February 2, 2018, and Dr. Mohammed prescribed Plaintiff medications. (See, Tr. 572–74). Plaintiff's medical records from her visit with Dr. Mohammed are in the record, and thus the description by Dr. Beyzavi of Plaintiff's last visit is not new evidence. (Id.).

Therefore, this Court finds Plaintiff's argument that the ALJ should have admitted the untimely February 2018 Letter of Dr. Beyzavi under the "unavoidable circumstances" language of 20 C.F.R. § 416.1435(b) fails in light of the record.[4]

## 2. The Appeals Council

Plaintiff argues that "[r]emand to the Appeals Council is required for further clarification" as to whether the February Letter should have been admitted as "new" and "material" evidence because the Appeals Council was "silent on" the February Letter. (See, Plf.'s Mem., [Docket No. 12], at 14–15).

Under 20 C.F.R. § 416.1470(a)(5), the Appeals Council must consider "<u>additional evidence</u> that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the <u>additional evidence</u> would change the outcome of the decision.'" <u>Craig M. v. Berryhill</u>, No. 18-cv-908 (NEB/DTS), 2019 WL 2648029, at *2 (D. Minn. June 10, 2019), report and recommendation adopted by 2019 WL 2644199 (D. Minn. June 26, 2019) (emphasis added). "However, in reviewing decisions based on an application for benefits, the Appeals Council will only consider <u>additional evidence</u> under paragraph (a)(5) of this section

---

[4] Plaintiff also argues that "[t]he ALJ's failure to admit . . . [the February Letter] into the record was not harmless." (Plf.'s Mem., [Docket No. 12], at 14). This Court need not address that argument because this Court finds in the first instance that the ALJ did not err in declining to admit the February Letter.

if you show good cause for not" complying with the Five-Day Rule. 20 C.F.R. § 416.1470(b) (emphasis added).

"[T]he Appeal's Council's failure to consider <u>additional evidence</u> under this rule may be the basis for remand by a reviewing court." <u>Thor S. v. Berryhill</u>, No. 18-cv-538-NEB-KMM, 2018 WL 7141873, at *4 (D. Minn. Dec. 13, 2018), report and recommendation adopted by 2019 WL 368459 (D. Minn. Jan. 30, 2019) (emphasis added) (quotations omitted); <u>accord</u>, <u>Craig M.</u>, 2019 WL 2648029, at *3. "Additional evidence" is that which is "submitted to [the Appeal's Council] after the ALJ's decision." <u>See</u>, <u>Perks v. Astrue</u>, 687 F.3d 1086, 1093 (8th Cir. 2012); <u>cf.</u> <u>Lamp</u>, 531 F.3d at 633 (ordering remand where it was unclear whether the Appeals Council considered evidence <u>submitted after the ALJ's decision</u>); <u>Gartman v. Apfel</u>, 220 F.3d 918, 922 (8th Cir. 2000) (same).

Here, the February 2018 Letter of Dr. Beyzavi was not submitted to the Appeals Council <u>after</u> the ALJ's decision; it was submitted directly to the ALJ <u>prior</u> to her decision. (Tr. 17–18). Therefore, the February Letter is not "additional evidence." <u>See</u>, <u>Perks</u>, 687 F.3d at 1093. As a result, 20 C.F.R. § 416.1470(a)(5) is not applicable, and the Appeals Council was not required to expressly note that it considered the February Letter. This Court further notes that, as explained in the preceding section, the February Letter did not contain "new" evidence, and Plaintiff did not establish good cause for failing to comply with the Five-Day Rule. In addition, because the February Letter did not contain new evidence, this Court finds that there is not a "reasonable probability" that the February Letter would have changed the ALJ's decision.

Accordingly, this Court finds Plaintiff's argument that that remand to the Appeals Council is required to address whether the February Letter should have been admitted as "new" and "material" evidence fails.

## B.  Opinion Evidence

Moving to the ALJ's decision itself, Plaintiff argue that it is not supported by substantial evidence because the ALJ improperly weighed the opinion evidence. (Plf.'s Mem., [Docket No. 12], at 15–18). Specifically, Plaintiff argues that Dr. Beyzavi's opinion should have been given more weight. (Id. at 16–18). Plaintiff also argues that the opinions of the State Agency consultants, Dr. Karayusuf, and Dr. Lace should have been given less weight because "[i]t was improper here to give the greatest weight to the providers who knew [Plaintiff] the least." (Id. at 17–18).

### 1. Dr. Beyzavi

Plaintiff argues that "Dr. Beyzavi's [o]pinion from February 2, 2016 [s]hould [h]ave been [g]iven [c]ontrolling [w]eight. (Plf.'s Mem., [Docket No. 12], at 16). Plaintiff further argues that "[e]ven if 'controlling weight' were not appropriate, Dr. Beyzavi's . . . opinions were entitled to at least 'substantial weight.'" (Id. at 17).

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002) (quoting 20 C.F.R. § 404.1527(d)(2)). However, a treating physician's opinion "do[es] not automatically control, since the record must be evaluated as a whole." Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

The Eighth Circuit has held that an ALJ may properly choose not to give controlling weight to the opinion of a treating physician when it is based solely on a claimant's subjective reports, or when the opinion is inconsistent with the treating physician's own treatment notes. Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015). Even when a treating physician's opinion is not

entitled to controlling weight, the opinion is typically entitled to substantial weight and should not ordinarily be disregarded without good reason. Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015).

However, an ALJ may properly choose to give the opinion of a treating physician no weight when it is inconsistent with the overall evidence in the medical record. Papesh, 786 F.3d at 1132. Further, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Miller, 784 F.3d at 477 (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010)). A treating physician's opinion "on the issue(s) of the nature and severity" of an impairment is given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2).

An ALJ may also discount or even disregard a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole. See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991).

In other words, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces her otherwise. See, Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007). Moreover, "opinions that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight." Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010) (citing Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)); see also, SSR 96-5p (July 2, 1996) ("Giving controlling weight to

[treating source] opinions would, in effect, confer upon the treating source the authority to make" disability determinations). When an ALJ chooses not to give controlling weight to the opinion of a treating physician, the regulations require that they explain their reasons for doing so. See, 20 C.F.R. § 404.1527(c)(2).

Here, Dr. Beyzavi is a "treating source" because he is a doctor that treated Plaintiff. See, Lacroix v. Barnhart, 465 F.3d 881, 885–86 (8th Cir. 2006) ("A 'treating source' is defined as a 'physician, psychologist, or other acceptable medical source' who treats the claimant." (quoting 20 C.F.R. §§ 404.152, 416.902)). Dr. Beyzavi offered two opinions regarding Plaintiff's mental impairments. (Plf.'s Mem., [Docket No. 12], at 16). The first opinion was in the form of a "[t]o whom it may concern" letter dated October 10, 2014 (the "2014 Letter), and the second opinion was a check-box form dated February 2, 2016 (the 2016 Opinion). (Plf.'s Mem., [Docket No. 12], at 16); see also, (Tr. 302–03, 379–81). Plaintiff argues that the 2014 Letter and Dr. Beyzavi's treatment notes "confirm that [Plaintiff] has consistently presented with behaviors consistent with 'marked' or 'extreme' limitations" and thus require the ALJ to grant "at least 'substantial weight' to the 2016 Opinion. (Plf.'s Mem., [Docket No. 12], at 17).

The 2014 Letter is from outside the adjudicated period. However, it may still be "relevant insofar as it shed[s] light on Plaintiff's condition after the onset date." See, Bistodeau v. Astrue, No. 10-1961 ADM/FLN, 2011 WL 2923863, at *3 (D. Minn. July 18, 2011); see also, Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n.6 (8th Cir. 1993). In the 2014 letter, Dr. Beyzavi diagnosed Plaintiff with "Major depressive disorder, Severe, recurrent without psychotic features" and "Posttraumatic stress disorder with delayed onset." (Tr. 302). Dr. Beyzavi stated Plaintiff's symptoms, noting that "she is very sad, tearful, anxious, worried, has recurrent flashbacks, sleeping problems, nightmares, and problems with concentration and memory in addition to having physical

18

health problems due to her pregnancy." (Id.). Dr. Beyzavi also stated that Plaintiff "has been taking Anti-depressant and Anxiety Medications prescribed by her psychiatrist." (Id.). This 2014 letter is consistent with Dr. Beyzavi's notes from within the adjudicated period, as well as, with the 2016 check-box form Opinion. (See, e.g., Tr. 304–13, 379–81, 557–70).

Nonetheless, the 2014 Letter does not provide any opinion on Plaintiff's limitations.[5] (See, Tr. 302–03). Plaintiff contends that "Dr. Beyzavi opined . . . [in the 2014 Letter] that [Plaintiff] required assistance with the daily care of her children due to limitations from her severe mental health conditions." (Plf.'s Mem., [Docket No. 12], at 16). Plaintiff misstates the record. What Dr. Beyzavi actually stated in the 2014 Letter was that Plaintiff needed to "be on her medications in order to be able to function on her daily activities, and taking care of her children." (Tr. 302). Dr. Beyzavi did not state that Plaintiff's overall ability to care for her children was limited in any way. (See, Tr. 302–03).

In the 2016 check-box form Opinion, Dr. Beyzavi diagnosed Plaintiff with "major depressive disorder, recurrent, severe without psychotic features" and "posttraumatic stress disorder with delayed onset." (Tr. 380). Dr. Beyzavi also stated Plaintiff's symptoms, stating Plaintiff "is very forgetful," "[h]as severe problems of concentration and short term memory," "cannot stay on task," "is severely anxious," "has panic attacks," is "very scared," "has paranoia," "has lack of trust toward others," "has recurrent flashbacks," "avoids public," is "very isolated," and "has sleeping problems—nightmares." (Tr. 379–80).

---

[5] The 2014 Letter appears to have been written in support of "granting [Plaintiff's] sister and her family [a] visa to come to the United States." (Tr. 302). In the 2014 Letter, Dr. Beyzavi stated, "In my professional opinion, it is very important for [Plaintiff] to have a family member here when she delivers her baby. . . . Please facilitate the process if granting her sister and her family visa to come to the United States and help [Plaintiff] when her baby is born." (Id.).

Dr. Beyzavi also provided her opinions as to Plaintiff's limitations by checking boxes that indicate limitations as "none," "mild," "moderate," "marked," or "extreme." Dr. Beyzavi checked a box that Plaintiff had "moderate" limitations understanding, remembering, and carrying out simple instructions, as well as, interacting appropriately with the public. (Id.). Dr. Beyzavi checked a box that Plaintiff had "marked" limitations in her ability to make judgements on simple work-related decisions. (Id.). And, Dr. Beyzavi checked a box that Plaintiff had "extreme" limitations understanding, remembering, and carrying out detailed instructions, interacting appropriately with supervisors and coworkers, responding appropriately to work pressures, and responding appropriately changes in a work routine. (Id.). Dr. Beyzavi concluded that "due to her symptoms [Plaintiff] will not be able to work." (Tr. 380).

The ALJ determined that the 2016 check-box form Opinion was inconsistent with the record as a whole, and she gave it "little weight." The ALJ clearly explained her reasons for that finding. (Tr. 26–29). This Court's review of the record as a whole indicates that the ALJ's stated reasons for discounting the 2016 check-box form Opinion of Dr. Beyzavi are supported by substantial evidence.

As a preliminary matter, this Court notes that Dr. Beyzavi's conclusion that Plaintiff "will not be able to work" is in effect an opinion that Plaintiff cannot work. (See, Tr. 380). That decision is reserved for the ALJ. See, e.g., Vossen, 612 F.3d at 1015; Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009); Daniel v. Saul, No. 17-cv-4322 (ECW), 2019 WL 4306353, at *9 (D. Minn. Sept. 11, 2019). Consequently, this portion of the 2016 Opinion "gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." Engquist v. Berryhill, No. 16-cv-3951, 2018 WL 1413460, at *21 (D. Minn. Mar. 21, 2018) (quoting House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007)).

20

The ALJ found that the 2016 Opinion was not supported by Plaintiff's "overall course of treatment." (Tr. 26). The ALJ noted that Plaintiff's "[m]ental health treatment during the relevant claim period has been <u>routine</u> and <u>conservative</u>." (Tr. 25). A conservative treatment plan is evidence that a claimant's symptoms are not as severe as alleged. <u>See, e.g.</u>, <u>Hamman v. Berryhill</u>, 680 F.App'x. 493, 495 (8th Cir. 2017); <u>Milam v. Colvin</u>, 794 F.3d 978, 985 (8th Cir. 2015); <u>Bauer v. Soc. Sec. Admin.</u>, 734 F. Supp. 2d 773, 806 (D. Minn. 2010); <u>LaCanne v. Massanari</u>, No. 00-2339 ADM/JMM, 2001 WL 1640124, at *2 (D. Minn. July 30, 2001). Moreover, "[a]n impairment which can be controlled by treatment or medication is not considered disabling." <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002); <u>accord</u>, <u>Turpin v. Colvin</u>, 750 F.3d 989, 993 (8th Cir. 2014).

The ALJ observed that Plaintiff had received "some outpatient therapy and psychotropic medications," but Plaintiff had not received inpatient treatment or electroconvulsive therapy. (Tr. 25). Nor had Plaintiff participated in a mental health day treatment program nor did she need mental health social services. (<u>Id.</u>). In March 2016, Plaintiff "reported that she was not involved in psychotherapy and that she did not wish to start." (Tr. 27; <u>accord</u>, Tr. 481).

The ALJ further noted that in January 2016, Plaintiff "reported that her sertraline (Zoloft) was 'working well.'" (Tr. 27; <u>accord</u>, Tr. 369; <u>see also</u>, Tr. 501). Plaintiff also reported that "[s]he has no problem sleeping at night." (Tr. 369; <u>accord</u>, Tr. 27). In March 2016, Plaintiff reported "that her psychotropic medication had given her the motivation to take care of her three children." (Tr. 27, <u>accord</u>, Tr. 481). The record also indicates that in October 2016, it was observed that Plaintiff "continues to do well in regards to her depression," and Plaintiff reported that her medication "has worked well for her." (Tr. 501, 503). The ALJ concluded that "the level of mental health care has not been nearly what one would expect given [Plaintiff's] complaints of debilitating mental symptoms and limitations." (<u>Id.</u>). Accordingly, the ALJ's finding that Dr. Beyzavi's 2016 check-

box form Opinion was not consistent with Plaintiff's overall course of treatment is supported by substantial evidence in the record. See, e.g., Hamman, 680 F.App'x. at 495; Milam, 794 F.3d at 985; Bauer, 734 F. Supp. 2d at 806; LaCanne, 2001 WL 1640124, at *2.

The ALJ further noted several additional ways in which the 2016 Opinion was inconsistent with the record as a whole. (See, 20–29). "The ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); see also, Papesh, 786 F.3d at 1132.

For example, "[d]uring the relevant claim period, [Plaintiff] has served as the primary caretaker to her young children." (Tr. 25, see, e.g., Tr. 69, 363, 481). Plaintiff also went "out in public alone," "shop[ed] in stores for groceries and clothing," "prepare[ed] simple meals," and "d[id] a variety of housework, such as cleaning, vacuuming, loading/unloading the dishwasher, and doing laundry." (Tr. 22–23; see, e.g., Tr. 69, 363). Plaintiff's ability to complete the above-listed tasks weighs against Dr. Beyzavi's assessment that Plaintiff had "moderate" limitations understanding, remembering, and carrying out simple instructions, and that Plaintiff had "marked" limitations in her ability to make judgements on simple work-related decisions and interact appropriately with the public.

Plaintiff was also "observed to be cooperative and polite" and "able to communicate effectively." (Tr. 22; see, e.g., 363). In addition, this Court notes that medical records consistently indicated that Plaintiff's "mood and affect were appropriate to situation" and that her memory and judgement were normal. (See, e.g., Tr. 343, 358, 363, 371, 483, 526). Plaintiff was even described as "spontaneous and very talkative." (Tr. 363). These observations of Plaintiff's behavior are inconsistent with Dr. Beyzavi's assessment that Plaintiff had "moderate" limitations interacting appropriately with the public, and that Plaintiff had "extreme" limitations interacting appropriately

with supervisors and coworkers. Accordingly, the ALJ's finding that the 2016 Opinion was inconsistent with the record as a whole is supported by substantial evidence in the record. See, e.g., Papesh, 786 F.3d at 1132; Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002).

Moreover, the 2016 Opinion is inconsistent with the other medical opinions in the record. (See, Tr. 51–59, 65–90, 362–64). "It is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians." Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007); accord, Renstrom, 680 F.3d at 1065. The State Agency consultants, Dr. Karayusuf, and Dr. Lace all found Plaintiff's limitations to be less severe than Dr. Beyzavi opined in his 2016 check-box form Opinion. (Compare, 51–59, 65–90, 362–64, with, Tr. 379–80).

For example, the State Agency consultants found that Plaintiff was "not significantly limited" in her ability to carry out simple instructions, whereas Dr. Beyzavi found Plaintiff's limitations in this area were "moderate." The State Agency consultants also found Plaintiff was "not significantly limited" in interacting with supervisors and coworkers whereas Dr. Beyzavi found Plaintiff's limitations in this area were "extreme." (See, Tr.  72–73, 86–87, 379–80). Likewise, Dr. Karayusuf and Dr. Lace both found Plaintiff's limitations to be less severe that Dr. Beyzavi opined in the 2016 Opinion. (See, 51–59, 65–90, 379–80). Neither the State Agency consultants, Dr. Karayusuf, nor Dr. Lace concluded that Plaintiff could not work or that she was disabled. (See, Tr. 51–59, 65–90, 362–64).

For the reasons mentioned above, this Court finds that the ALJ's decision to discount Dr. Beyzavi's 2016 check-box form Opinion was supported by substantial evidence in the record. See, e.g., Hamman, 680 F.App'x. at 495; Milam, 794 F.3d at 985; Papesh, 786 F.3d at 1132; Bauer, 734 F. Supp. 2d at 806; Estes, 275 F.3d at 725; LaCanne, 2001 WL 1640124, at *2.

Plaintiff further argues that the 2016 Opinion is supported by Dr. Beyzavi's treatment notes. (See, Plf.'s Mem., [Docket No. 12], at 17). However, the ALJ found that Dr. Beyzavi's treatment notes lacked "objective data," and "do not document the severity of [Plaintiff's] symptoms." (Tr. 26). Dr. Lace's testimony, as well as, the treatment notes themselves support this finding. (See, Tr. 26, 51–58).

The ALJ further found that Dr. Beyzavi's notes "consist mostly of self-reports" of Plaintiff's symptoms. (Tr. 26). "[I]t is permissible for an ALJ to discredit opinions that are premised on a claimant's own subjective complaints in the absence of objective findings." Brian v. Saul, No. 18-cv-1893 (HB), 2019 WL 4082948, at *9 (D. Minn. Aug. 29, 2019) (citing Kirby, 500 F.3d at 709); see also, Papesh, 786 F.3d at 1132. Although Plaintiff does not cite to any of Dr. Beyzavi's notes in support of her argument, she does point to the transcriptions contained in the untimely submitted February 2018 Letter of Dr. Beyzavi. (See, Plf.'s Mem., [Docket No. 12], at 17).

The note transcriptions in the February 2018 Letter contain isolated statements such as, "[Plaintiff] seems very sad, more angry and frustrated," "Seems very tired—board [sic]—seems her depression has been more affected by staying at home and having nobody to see or visit her," "Seems very sad—Anxious—worried—affected by their housing issues. Worried about her mother in Iraq," and similar cherry-picked statements. (Tr. 38–39). Plaintiff argues that these statements support Dr. Beyzavi's 2016 check-box form Opinion. (Tr. 17). On the other hand, Dr. Beyzavi's notes often simply list Plaintiff's self-reported symptoms and the medications that she is taking, which supports the ALJ's finding. (See, e.g., Tr. 304–13, 557–70). The testimony of Dr. Lace, who pointed to specific examples contained in the notes, further supports the ALJ's finding.

24

(See, Tr. 51–58). Moreover, Plaintiff's reports to other medical providers contradict Dr. Beyzavi's treatment notes. (See, e.g., Tr. 343, 358, 363, 369, 371, 481, 483, 501, 503, 526).

Plaintiff is essentially asking this Court to reweigh the whole of the medical evidence and to come to a different conclusion than the ALJ; this the court cannot do. See, Milam, 794 F.3d at 983; Woolf, 3 F.3d at 1213. To the extent that Plaintiff argues that there was also substantial evidence in the record that might have supported a finding of disability, this Court may not reverse the ALJ simply because substantial evidence exists to support an opposite conclusion. See, Milam, 794 F.3d at 983. Nor can this Court substitute its own judgment or findings of fact for those of the ALJ. See, Woolf, 3 F.3d at 1213. The Court "must consider evidence that both supports and detracts from the ALJ's decision," and it "must affirm the denial of benefits if 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings.'" See, Milam, 794 F.3d at 983 (citations omitted) (emphasis added). Such is the present case now before this Court.

Therefore, this Court finds Plaintiff's argument that Dr. Beyzavi's 2016 check-box form Opinion should have been given "controlling weight" is unpersuasive in light of the record as a whole.

### 2. Other Providers

Plaintiff argues that the opinions of Dr. Karayusef, Dr. Lace, and the State Agency consultants, Dr. Lovko and Dr. Sullivan, were given too much weight because "[i]t was improper here to give the greatest weight to the providers who knew [Plaintiff] the least." (See, Plf.'s Mem., [Docket No. 12], at 17–18). Plaintiff does not specifically articulate any issue with these opinions. (See, Id.). Her only objection appears to be that they are opinions proffered by a consultative examiner who only saw Plaintiff a single time, a non-examining testifying expert, and non-

examining State Agency psychological consultants, and therefore it was improper for the ALJ to assign these opinions "great weight." (See, Id.).

Although the opinions of consultative examiners, non-examining testifying experts, and non-examining State Agency consultants may not constitute substantial evidence on their own, an ALJ does not err when she relies on these opinions and they are supported by the rest of record. See, Turpin v. Colvin, 750 F.3d 989, 994 (8th Cir. 2014); Johansen v. Astrue, No. 10-2076 (DWF/SER), 2011 WL 4583831, at *13 (D. Minn. Aug. 15, 2011), report and recommendation adopted by 2011 WL 4583828 (D. Minn. Sept. 30, 2011); Nelson v. Astrue, No. 06-4298 (DWF/SRN), 2008 WL 822157, at *17 (D. Minn. Mar. 26, 2008).

Courts have routinely upheld ALJ decisions that give some weight to the opinions of consultative examiners, testifying experts, and State Agency consultants when the ALJ's decision to do so is supported by substantial evidence in the record. See, e.g., Franks v. Colvin, No.13-2904 MJD/FLN, 2014 WL 6911291, at *13 (D. Minn. Dec. 8, 2014) (finding the ALJ did not err by giving "significant weight" to a one-time consultative examiner); Johansen, 2011 WL 4583831, at *14 ("[T]he ALJ did not err by giving 'significant weight' to the opinions of the state agency consultants"); Nelson, 2008 WL 822157, at *17 (finding the ALJ did not err by giving the opinion of a testifying medical expert "great weight"). Such is the circumstance in the present case.

Here, the opinions of Dr. Karayusef, Dr. Lace, and the State Agency consultants are consistent with each other, and more importantly, consistent with the record as a whole. Dr. Karayusuf reviewed Plaintiff's medical records and examined her. (Tr. 362–63). He concluded that Plaintiff was "able to understand, retain and follow simple instructions." (Tr. 363). "She [wa]s restricted to superficial interactions with fellow workers, supervisors, and the public." (Id.). And that "in the context of performing repetitive tasks, she [wa]s able to maintain pace and persistence."

(Id.). Dr. Karayusuf supported his opinion by noting Plaintiff's daily activities and demeanor during the examination. (Id.). After reviewing the record as a whole, the ALJ concluded that it supported Dr. Karayusuf's opinion. (See, Tr. 29).

Dr. Lace provided an overview of the record, noted where he observed inconsistencies, and concluded that Plaintiff "would be limited to routine, repetitive tasks that are slow paced" and did not involve "daily production quotas." (Tr. 54–55). Dr. Lace cited to specific documents in the record that supported this conclusion. (Tr. 52–55; see also, Tr. 358, 362–64, 378, 487–503, 572–79). Dr. Lace further explained, citing to specific portions of Dr. Beyzavi's notes in support, why he disagreed with the 2016 check-box form Opinion. (Tr. 56–58; see also, 307, 557–70). After reviewing the record as a whole, the ALJ concluded that it supported Dr. Lace's opinion. (See, Tr. 23, 26, 28–29).

As previously mentioned, the State Agency consultants reviewed Plaintiff's medical records and concluded Plaintiff was "not significantly limited" in her ability to carry out simple instructions or in interacting with supervisors and coworkers. (Tr. 72–73, 86–87). The State Agency consultants cited to specific medical records in support of their decisions. (See, Tr. 73–74, 88; see also, Tr. 302–03, 362–63). Like Dr. Karayusuf, the State Agency consultants pointed to Plaintiff's daily activities in support of their opinions. (See, Tr. 69, 74, 83, 88). After reviewing the record as a whole, the ALJ concluded that it supported the State Agency consultant's opinions. (See, Tr. 29).

While the ALJ relied on the foregoing opinions, she also considered them in the context of the medical record as a whole. (Tr. 18; see also, Tr. 20–29). Furthermore, it is evident from the record that the ALJ did not rely on those opinions as the sole evidence for reaching her decision. (See, Tr. 18–29, 65–90). Because the ALJ conducted an independent review of the evidence in the

record as a whole and found it consistent with those opinions, the ALJ was permitted to give them "great weight." See, Turpin, 750 F.3d at 994; Franks, 2014 WL 6911291, at *13; Johansen, 2011 WL 4583831, at *14; Nelson, 2008 WL 822157, at *17. For the reasons mentioned above, the ALJ's decision to give the opinions of medical reviewers other than Dr. Beyzavi "great weight" was supported by substantial evidence in the record.

Therefore, this Court finds Plaintiff's argument that the opinions of Dr. Karayusef, Dr. Lace, and the State Agency consultants, Dr. Lovko and Dr. Sullivan, were given too much weight fails.

### C. Severe Impairments

Plaintiff next argues that the ALJ erred by failing to identify Plaintiff's back problems as a severe impairment.[6] (See, Plf.'s Mem., [Docket No. 12], at 18–20). Plaintiff contends that the ALJ erred in determining that Plaintiff "did not have a medically determinable spinal impairment diagnosed by an acceptable medical source." (Id. at 19).

"An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do work activities." Kirby, 500 F.3d at 707. "It is the claimant's burden to establish that h[er] impairment . . . is severe." Id. If the impairment would have no more than a minimal effect on the claimant's ability to work, then it is not severe. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007). "Diagnoses alone do not demonstrate the existence of severe impairments." Michlitsch v. Berryhill, No. 17-cv-3470 (MJD/TNL), 2018 WL 3150267, at *14 (D. Minn. June 12, 2018). Severity is not an onerous requirement for the claimant to meet, see, Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989), but it is also not a toothless standard, and courts have upheld on numerous occasions the

---

[6] Plaintiff also argues that this "resulted in [an] incomplete RFC." (Plf.'s Mem., [Docket No. 12], at 18). This Court will address the RFC in the following section.

Commissioner's finding that a claimant failed to make this showing. See, e.g., Page, 484 F.3d at 1043–44; Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); Simmons, 264 F.3d at 755; Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997); Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996).

Here, the ALJ cited to specific evidence in the record to support her determination that Plaintiff's back problems were not a severe impairment. (See, 25–28). This Court has reviewed the entire record and has, for the reasons mentioned below, concluded that the ALJ's decision was supported by substantial evidence.

The ALJ noted that Plaintiff testified she could "lift no more than 10 pounds, and walk for no more than 10 minutes before having to stop for 10 minutes," but upon reviewing the record as a whole, the ALJ concluded that "[t]he overall evidence d[id] not support the alleged loss of functioning." (Tr. 25; see also, Tr. 197). It is instructive to note that Plaintiff does not directly dispute the ALJ's credibility determination.

The ALJ found that Plaintiff's daily activities indicated that her back problems were not as severe as she alleged. (See, Tr. 22–23, 25, 28; see also, 193–97, 363, 485). Plaintiff "serves as a primary caretaker for her three young children." (Tr. 25; see also, 22–23, 193–97, 363, 485). In July 2015, Plaintiff reported "carrying her baby more." (Tr. 326). In October 2015, Plaintiff reported to her physical therapist that she experienced "shoulder pain [due to] carrying her daughter for an hour." (Tr. 466 (emphasis added)). In July 2016, Plaintiff indicated her back pain "gets exacerbated when she is doing a lot of lifting." (Tr. 485 (emphasis added)). Additionally, Plaintiff's medical records indicate that she was "still breastfeeding her youngest" which "seem[ed] to make her back pain worse." (Id.). In October 2016, Plaintiff's medical records note that she was continuing to breast feed her two-year-old daughter and "holding her up" was causing

strain on her neck and arm. (Tr. 501). This is evidence that Plaintiff can lift more than she alleges, which supports the ALJ's determination that Plaintiff's back problems are not a severe impairment. See, e.g., Kirby, 500 F.3d at 707; Page, 484 F.3d at 1043.

Moreover, Plaintiff cooks for her family, goes shopping, and performs household chores. (See, e.g., Tr. 23, 193–97, 363). Plaintiff reported that she cleans for two hours, three times per week. (Tr. 194). She reported that she does laundry once a week. (Id.). And Plaintiff reported that she shops for two hours, once a week. (Tr. 195). This is additional evidence that Plaintiff's symptoms are not as severe as alleged and would not significantly limit her ability to do work activities, which supports the ALJ's determination that Plaintiff's back problems are not a severe impairment. See, e.g., Kirby, 500 F.3d at 707; Page, 484 F.3d at 1043.

The ALJ also found that Plaintiff's overall course of treatment and the objective medical evidence indicated that Plaintiff's back problems were not a severe impairment. (See, Tr.25–28). A conservative treatment plan is evidence that a claimant's symptoms are not as severe as alleged. See, e.g., Hamman v. Berryhill, 680 F.App'x. 493, 495 (8th Cir. 2017); Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015); Bauer v. Soc. Sec. Admin., 734 F. Supp. 2d 773, 806 (D. Minn. 2010); LaCanne v. Massanari, No. 00-2339 ADM/JMM, 2001 WL 1640124, at *2 (D. Minn. July 30, 2001); see also, Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014) ("An ALJ . . . may discredit complaints . . . if the claimant does not seek regular medical treatment.").

Plaintiff has turned down recommended treatment for her back problems on several occasions. (See, e.g., Tr. 27, 28, 357, 360, 369, 485, 487, 501). In November 2015, Plaintiff's medical records indicate that "an epidural injection was recommended, but [Plaintiff] did not pursue treatment." (Tr. 357). Later that same month, "pool therapy" was recommended, but Plaintiff stated that "she is busy" and "would like to wait." (Tr. 360). In January 2016, Plaintiff

stated that "she d[id] not wish to see a spine specialist at t[hat] time." (Tr. 369). In July 2016, Plaintiff's medical records note that "she has not wanted to pursue injections or surgery in the past," and that she declined physical therapy because "her children were home all day with her during summer break." (Tr. 485, 487). In October 2016, Plaintiff again declined physical therapy because "she d[id] not feel she w[ould] have the time." (Tr. 501). This supports the ALJ's determination that Plaintiff's back problems are not a severe impairment. See, e.g., Hamman, 680 F.App'x. at 495; Milam, 794 F.3d at 985; Turpin, 750 F.3d at 993; Bauer, 734 F. Supp. 2d at 806; LaCanne, 2001 WL 1640124, at *2.

As the ALJ noted, the record further indicates that the treatment Plaintiff did receive for her back problems was effective. (See, 26, 27; see also, 341, 369, 467, 469, 485, 501, 506, 508). "An impairment which can be controlled by treatment or medication is not considered disabling." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); accord, Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014). Plaintiff regularly reported that ibuprofen and Tylenol 3 "helped significantly" with her back pain. (See, e.g., Tr. 341, 369, 485). In addition, Plaintiff's medical records indicate that she only took these medications "on occasion and not every day." (Tr. 485; see also, Tr. 369). This supports the ALJ's determination that Plaintiff's back problems are not a severe impairment. See, Turpin, 750 F.3d at 993; Estes, 275 F.3d at 725.

Plaintiff has also reported and several of her medical records indicate that physical therapy was effective. (See, 26, 341, 369, 464, 472, 485, 501, 506, 508). In October 2015, Plaintiff's physical therapy records indicate Plaintiff "[s]tate[d] she [wa]s having less pain with daily tasks," and "Good progress[] for no discomfort with daily tasks." (Tr. 467, 469). Nonetheless, Plaintiff has also reported and several of her medical records indicate that physical therapy was not always effective. (See, 26, 48, 345, 360, 547). "It is the function of the ALJ to weigh conflicting evidence."

Dols v. Saul, 931 F.3d 741, 749 (8th Cir. 2019) (quoting Kirby, 500 F.3d at 709). Moreover, Courts should "not reverse merely because evidence also points to an alternative outcome." See, Id. (quoting Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007)); see also, Milam, 794 F.3d at 983; Woolf, 3 F.3d at 1213.

Plaintiff argues that the ALJ erred in determining that Plaintiff "did not have a medically determinable spinal impairment diagnosed by an acceptable medical source." (Plf.'s Mem., [Docket No. 12], at 19). In making this argument, Plaintiff misstates the record.

Plaintiff received a magnetic resonance imaging test (MRI) that showed "disc bulge at L5-S1 with annular tear" (the "2015 MRI"). (Tr. 341; accord, Tr. 353). The 2015 MRI was interpreted by Dr. McMillan. (Tr. 353). Subsequently, Ms. Hiti, PA-C, diagnosed Plaintiff with "[d]egenerative joint disease (DJD) of lumbar spine." (Tr. 347). Plaintiff later saw Dr. Groeschel for an "evaluation of back pain and headaches." (Tr. 361). It is undisputed that Dr. McMillan and Dr. Groeschel are "acceptable medical sources." (See, Plf.'s Mem., [Docket No. 12], at 19; Def.'s Mem., [Docket No. 14], at 18–19). It is also undisputed that Ms. Hiti is not an "acceptable medical source." (See, Plf.'s Mem., [Docket No. 12], at 19; Def.'s Mem., [Docket No. 14], at 18–19).

Plaintiff contends that because Dr. McMillan provided the "objective basis" for Ms. Hiti's diagnosis and "the chronic back pain [was] confirmed by" Dr. Groeschel, Plaintiff was diagnosed with a medically determinable spinal impairment. (Plf.'s Mem., [Docket No. 12], at 19). Plaintiff strongly implies that Dr. Groeschel confirmed Ms. Hiti's diagnosis. (See, Id.). This is incorrect.

Dr. Groeschel did not have access to Plaintiff's medical records, thus she could not have confirmed any earlier diagnosis. (See, Tr. 360). Indeed, Dr. Groeschel did not diagnose Plaintiff with any condition. (Id.). She merely noted Plaintiff's subjective symptoms and recommended "pool therapy." (Id.). Plaintiff declined to pursue pool therapy. (Id.). Likewise, Dr. McMillan did

not diagnose Plaintiff with a medically determinable spinal impairment. (See, Tr. 353). Plaintiff has not argued that any other records indicate that Plaintiff was diagnosed as having a medically determinable spine impairment. (See, Plf.'s Mem., [Docket No. 12], at 19). Accordingly, the ALJ did not err in determining that Plaintiff did not have a medically determinable spinal impairment diagnosed by an "acceptable medical source."

Although the 2015 MRI may be evidence of a severe impairment, the ALJ considered the 2015 MRI in her determination that Plaintiff's back problems did not amount to a severe impairment. (Tr. 20, 26, 27). This Court may not reverse the ALJ simply because substantial evidence may also support an opposite conclusion. See, Milam, 794 F.3d at 983. This Court may not reweigh evidence that the ALJ considered and come to a different conclusion than the ALJ where there is substantial evidence in the record to support the ALJ's decision. See, Milam, 794 F.3d at 983; Woolf, 3 F.3d at 1213.

Therefore, this Court finds that the ALJ's decision not to identify Plaintiff's back problems as a severe impairment is supported by the record as a whole.

### D.  RFC Limitations

Plaintiff's next category of argument is that the RFC is not supported by substantial evidence because it does not incorporate all of Plaintiff's limitations (Plf.'s Mem., [Docket No. 12], at 19–21). Specifically, Plaintiff argues that the RFC fails to "incorporate limitations from [Plaintiff's] severe spinal impairment" and "limitations for illiteracy." (Id.).

"A claimant's RFC represents the most [s]he can do despite the combined effects of all of h[er] credible limitations and must be based on all credible evidence." McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011); accord, 20 C.F.R. § 404.1545(a)(1). "A disability claimant has the burden to establish her RFC." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). "The ALJ

determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." Id. at 591. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of a claimant's ability to function in the workplace. However, there is no requirement that an RFC finding be supported by a specific medical opinion." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016). "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012).

Plaintiff argues that the RFC in the present case is "inconsistent with the record" because the 2015 MRI, physical therapy records, and Plaintiff's "subjective complaints of pain in performing activities" require the RFC to include additional accommodations or limitations. (Plf.'s Mem., [Docket No. 12], at 20–21).

In making her RFC determination, "[t]he ALJ was entitled to consider all of the evidence in the record." Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005); see also, Stormo v. Barnhart; 377 F.3d 801, 807 (8th Cir. 2004) ("The ALJ should consider all evidence in the record . . . ." (quotations omitted)). In reference to the 2015 MRI, the record indicates that the ALJ considered it and determined Plaintiff does not have limitations beyond the RFC. (See, Tr. 20, 24, 26, 27). Indeed, the ALJ explicitly stated that "[e]ven if it were found [Plaintiff] ha[d] a medically determinable back impairment, the above exam findings and the course of treatment for it overall in the record as well as her overall functioning would not limit her beyond the residual functional capacity assessed." (Tr. 27).

In reference to the physical therapy records, this Court notes that Plaintiff only selectively cites to a single record in support of her argument yet she contends that the physical therapy record

as a whole supports additional limitations. (See, Id.). The physical therapy records contain some inconsistent evidence regarding Plaintiff's limitations. (See, e.g., 318–36, 459–73). For example, as Plaintiff observed, on August 17, 2015, Plaintiff reported she "[wa]s unable to get up off the floor." [7] (Tr. 328). However, on November 2, 2015, the physical therapy records indicate Plaintiff stated "she [wa]s having less pain with daily tasks overall," and she was discharged because "progress ha[d] plateaued." (Tr. 472–73). Her physical therapist opined that Plaintiff's "prognosis at time of discharge was good." (Tr. 472). Moreover, as explained above, the record as a whole contains other evidence regarding both the effectiveness and ineffectiveness of some physical therapy on Plaintiff's symptoms. (Compare, Tr. 26, 341, 369, 464, 472, 485, 501, 506, 508, with, Tr. 26, 48, 345, 360, 547).

In reference to Plaintiff's subjective complaints of pain, the ALJ reviewed the entire record and found they were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 25). Plaintiff does not directly challenge this credibility finding by the ALJ.

As previously observed, there is substantial evidence in the record as a whole to support the ALJ's RFC determination. Plaintiff's daily activities indicated that her back problems were not a severe limitation or impairment. She was able to care for her children, go shopping, cook meals, and perform household chores. (See, e.g., 193–97, 326, 363, 466, 485, 501). And Plaintiff's overall conservative course of treatment indicated that her back problems were not as severe as alleged. She turned down recommended treatment on several occasions, medical records indicate that her medications and physical therapy were often effective, and no "acceptable medical source" diagnosed Plaintiff with a medically determinable spinal impairment. (See, e.g., 341, 369, 467,

---

[7] This Court notes, however, that the same day Plaintiff's physical therapist noted she "ha[d] not been doing her exercises at home" and had "not been to therapy for 3 weeks." (Tr. 328).

469, 485, 501, 506, 508). In addition, the ALJ points to several other objective findings in Plaintiff's medical records that support the ALJ's RFC determination. (See, e.g., 23, 26–27, 28).

Plaintiff is once again merely asking this Court to reweigh the medical evidence and to come to a different conclusion than the ALJ. To the extent that Plaintiff argues that there was also substantial evidence in the record that might have supported a finding of disability, this Court may <u>not</u> reverse the ALJ simply because some substantial evidence may support an opposite conclusion. See, <u>Milam</u>, 794 F.3d 983; <u>Woolf</u>, 3 F.3d at 1213.

Plaintiff next argues that the RFC is not supported by substantial evidence because it does not include limitations for illiteracy. (Plf.'s Mem., [Docket No. 12], at 21). Specifically, Plaintiff argues that the RFC must include additional limitations because "[e]ven work performed at the SVP 1 or 2 level will require an employee to learn how to perform a task," and "it is unclear how [Plaintiff] will be able to learn how to perform even a menial task" given that the RFC limits her to superficial interactions with coworkers and she is illiterate. (<u>Id.</u>).

The record indicates the ALJ considered Plaintiff's illiteracy in her decision. While analyzing Plaintiff's ability to understand, remember, and apply information, the ALJ specifically noted that Plaintiff "does not understand written instructions because she cannot read." (Tr. 22). The ALJ also specifically noted that Plaintiff "is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English." (Tr. 29). At the hearing, the ALJ presented IVE Zilka with a hypothetical of an individual that "would be illiterate and unable to communicate in English." (Tr. 59).

Plaintiff does not argue the ALJ failed to consider that Plaintiff was illiterate. (See, Plf.'s Mem., [Docket No. 12], at 21). Nor does Plaintiff directly challenge the ALJ's findings at step five by presenting a specific argument as to <u>why</u> Plaintiff's illiteracy prevents her from performing the

occupations specified by the ALJ. (See, Id.). Instead, Plaintiff broadly asserts that the RFC is not supported by substantial evidence because Plaintiff's illiteracy, coupled with the RFC's limitations on Plaintiffs' interactions with coworkers, prevents her from learning how to perform any occupation. (See, Id.). The Court finds Plaintiff's argument unpersuasive.

However, as already discussed, the record indicates that both the ALJ and IVE Zilka considered Plaintiff's illiteracy and concluded that she could still perform within her RFC limitations the requirements of a laundry laborer, cart attendant, and truck cleaner. (See, Tr. 30, 60–61). Accordingly the RFC determined by the ALJ in this case is supported by substantial evidence in the record as a whole.

### E.  IVE Testimony

Plaintiff lastly argues that the ALJ's decision is not supported by substantial evidence because "[t]he ALJ [f]ailed to [a]dequately [a]ddress [d]iscrepancies between [v]ocational [e]xpert [t]estimony and the DOT" in violation of SSR 00-4p. (See, Plf.'s Mem., [Docket No. 12], at 21–22).[8]

The Eighth Circuit has "construed SSR 00-4p as placing on the ALJ an affirmative responsibility to ask about 'any possible conflict' between VE evidence and the DOT, and to obtain an explanation for any such conflict, before relying on VE evidence to support a determination the claimant is not disabled." Welsh v. Colvin, 765 F.3d 926, 929 (8th Cir. 2014). However, an ALJ may rely on a VE's experience in job placement and career counselling in crediting VE testimony over a DOT listing. (Id.).

---

[8] This Court notes that Plaintiff does not directly challenge the ALJ's step five determination that Plaintiff could perform work that exists in significant numbers in the national economy. (See, Plf.'s Mem., [Docket No. 12], at 21–22). Instead, Plaintiff argues that the ALJ has failed to meet her obligation under SSR 00-4p, and therefore her decision is not supported by substantial evidence. (See, Id.).

The Eighth Circuit has also held that SSR 00-4p "does not impose a duty on the ALJ to obtain a reasonable explanation when the VE simply testifies to information not found in the DOT—but that does not conflict with it." <u>Courtney v. Comm'r, Soc. Sec. Admin.</u>, 894 F.3d 1000, 1003 (8th Cir. 2018). Therefore, SSR 00-4p does not place "an affirmative responsibility on the ALJ to inquire further when a VE merely testifies to information not included in the DOT, but that does not conflict with it." (<u>Id.</u>).

Here, Plaintiff only generally asserts that "[w]hen the ALJ posed a hypothetical scenario for [IVE] Zilka's consideration, several of the limitations were in non-programmatic language outside of what is contemplated by the DOT or its companion publication the Selected Characteristics of Occupations (SCO)." (Plf.'s Mem., [Docket No. 12], at 21). However, Plaintiff does not advance any specific argument or cite to the record in support of this broad assertion. (<u>See</u>, <u>Id.</u> at 21–22). Moreover, Plaintiff does not now even indicate <u>which limitations</u> she believes were outside what is contemplated by the DOT. (<u>See</u>, <u>Id.</u>).

Plaintiff then contends that "[w]hen asked about discrepancies between her testimony and the DOT, [IVE] Zilka responded that any variances or areas not explicitly described in the DOT were informed by her experience." (<u>Id.</u>). Plaintiff further contends that IVE "Zilka clarified that she was speaking specifically to tasks that were 'fixed and predictable.'" (<u>Id.</u> at 22). Plaintiff misstates the record here. When asked if her testimony was "consistent with how [the occupations are] described in the Dictionary of Occupational Titles," IVE Zilka responded that <u>it was</u>. (Tr. 61). She then added, "I have also supplemented my testimony based on my 25 years of experience as a licensed vocational consultant doing job placement, labor market surveys and job site analysis, particularly in regards to the fixed and predictable tasks . . . ." (<u>Id.</u>). IVE Zilka testified that her testimony was consistent with the DOT. (<u>Id.</u>). She did not testify to "variances" or "discrepancies"

between her testimony and the DOT. (Id.). By misstating the record, Plaintiff attempts to manufacture a conflict where none exists.

The ALJ explicitly stated that "[p]ursuant to SSR 00-4p, [she] has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (Tr. 30). Plaintiff has not pointed to any specific in the record evidence that would detract from this finding. (See, Plf.'s Mem., [Docket No. 12], at 21–22). Accordingly, to the extent Plaintiff argues that "conflicts have not been resolved" between IVE Zilka's testimony and the DOT in violation of SSR 00-4p, this Court finds Plaintiff's argument unpersuasive.

The ALJ further stated, "[f]or areas not described in the Dictionary of Occupational Titles, such as production rate pace, the vocational expert testified to using her 25 years of professional experience as a licensed vocational consultant doing job placement, labor market surveys, and job site analyses to know the cited occupations can be performed within the elements set forth in the residual functional capacity." (Tr. 30 (emphasis added)). The ALJ found "this explanation reasonable and [IVE Zilka's] testimony persuasive" and relied on it in making her determination. The ALJ had no obligation under SSR 00-4p to inquire further. See, Courtney, 894 F.3d at 1003; see also, Twyford v. Comm'r, Soc. Sec. Admin., 959 F.3d 512, 519 (8th Cir. 2019) ("Because 'the ALJ described [Plaintiff's] limitations to the VE, the VE responded with possible jobs, and the VE's testimony did not conflict with the DOT,' the ALJ was entitled to rely upon her testimony." (quoting Courtney, 894 F.3d at 1005)). Moreover, the ALJ was permitted to rely on the VE's experience. See, Welsh, 765 F.3d at 929; see also, Higgins v. Comm'r of Soc. Sec., 898 F.3d 793, 796 (8th Cir. 2018) ("As always, an ALJ may rely on VE testimony about common workplace practices based upon the expert's knowledge and experience."). Consequently, to the extent Plaintiff argues that the ALJ failed to meet her obligations under SSR 00-4p because IVE Zilka's

testified to information not described in the DOT, this Court finds Plaintiff's argument here too unpersuasive.

Plaintiff also observes that IVE "Zilka was not asked and did not provide information about whether [Plaintiff's] illiteracy and lack of English would in any way reduce the limited number jobs [sic] within the three DOT categories cited." (Plf.'s Mem., [Docket No. 12], at 22). This Court has already determined above that IVE Zilka and the ALJ did consider Plaintiff's illiteracy, and it will not address this issue again here. In addition, Plaintiff does not cite to any evidence to support the assertion that the number of jobs available within the RFC would be reduced by Plaintiff's illiteracy, or that the lack of English proficiency created a conflict between IVE Zilka's testimony and the DOT. (See, Id. at 21–22).

This Court finds that the ALJ's decision did not fail to meet the requirements of SSR 00-4p.

## V. Conclusion

The Court's review of the record as a whole indicates that the ALJ's decision that Plaintiff was not disabled as defined by the Social Security Administration Act was supported by substantial evidence in the record as a whole.

Therefore, based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Plaintiff's Motion for Summary Judgment, [Docket No. 13], be **DENIED**; and

2.    Defendant's Motion for Summary Judgment, [Docket No. 16], be **GRANTED**.


Dated:  January 31, 2020                                   s/ Leo I. Brisbois
                                                          Hon. Leo I. Brisbois
                                                          United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).